**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DEBRA TURNER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-1668 |
| | § | |
| | § | |
| ST. LUKE'S EPISCOPAL HEALTH | § | |
| SYSTEM, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Debra Turner sued her current employer, St. Luke's Episcopal Health System, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and intentional infliction of emotional distress. (Docket Entry No. 1). Turner alleges that St. Luke's discriminated against her by failing to promote her on the basis of her national origin (African-American) and her sex (female) and by subjecting her to a hostile work environment based on her national origin and sex. Turner also alleges that St. Luke's retaliated against her for filing a discrimination charge with the EEOC. St. Luke's filed a motion for summary judgment as to both the federal and state claims. (Docket Entry No. 15). Turner responded, (Docket Entry No. 16), and St. Luke's replied, (Docket Entry No. 17).

Based on a careful review of the pleadings, the motion, response, and reply, the

record, and the applicable law, this court grants St. Luke's motion for summary judgment and by separate order enters final judgment.  The reasons are set out below.

## I.     Background

St. Luke's hired Turner as a Technology Service Center ("TSC") Consultant in August 1997.  (Docket Entry No. 15., Ex. A at 23).  As a TSC Consultant, Turner's job responsibilities included providing telephone support to local and remote users of St. Luke's information processing systems.  (*Id.*, Ex. A at 29).  Turner's job title was changed in 2004 from "TSC Consultant" to "Senior Technical Support Analyst," but there was no change in her duties.  (*Id.*, Ex. A at 51–52).  In 2000, Susan Lymon became the TSC supervisor.  (*Id.*, Ex. A at 27–28).  Turner alleges that Lyman was abusive towards her.  Turner specifically alleges that Lyman called her "stupid," demeaned her, and elbowed her in the chest.  Turner complained to St. Luke's management about Lyman.  (*Id.*, Ex. B at 6–7, 11–12).  St. Luke's fired Lyman in November 2003 because of her inappropriate behavior toward employees.  (*Id.*, Ex. A-27).

In June 2004, Kenneth Dunphy became the TSC supervisor.  (Docket Entry No. 15, Ex. C at 7).  Dunphy completed Turner's 2004 performance appraisal.  The appraisal form allows a supervisor to give a score of zero, five, ten, fifteen, or twenty in six different performance categories.  A score of five means that the employee achieved 75% of expectations, a ten means the employee fully met expectations, and a fifteen means the employee exceeded expectations.  Turner received an overall score of fifteen on her 2004 performance appraisal, meaning that she exceeded expectations.  (*Id.*, Exs. A-22, D at

18–19).  A TSC employee generally receives a "ticket" for answering, or "opening," a phone call.  Tickets and phone calls are measures of an employee's work volume.  An answered phone call is "closed" when the TSC employee resolves the customer's question.  (Docket Entry No. 16, Ex. G at 33).  The June 2004 performance appraisal noted that Turner had a "good resolution ratio between her open tickets v closed tickets per month (Opened 5589 Closed 3367 % Resolved 60%)," that "Debra is always pleasant when answering calls that come into the TSC," that "Debra interacts very well with member [sic] of the TSC," and that "Debra has a very good temperament for customer service."

Dunphy also completed Turner's 2005 performance appraisal.  (Docket Entry No. 15, Ex. A-22).  Turner received an overall score of fourteen on her 2005 performance appraisal. Turner increased her score on two out of the eight evaluation criteria, but her overall score decreased because the customer-service team score, the only one of the eight evaluation criteria based on overall team performance, decreased.  The 2005 performance appraisal noted that Turner had "done a good job of increasing her resolution," raising "her resolution rate from 61% to 72.89% (through October 2005) while answering 7,600 phone calls."  The appraisal noted that Turner "handles her day to day duties in a professional manner," that she "interacts very well with members of the TSC," and that she "is a compassionate person and works well with customers."  (*Id.*, Ex. A-23).  Turner testified that she made a particular

effort to increase her resolution rate as opposed to the overall number of calls answered, or "opened," because she was told that promotions were based on resolution rate. (Docket Entry No. 16 at 6).

In January 2005, Dunphy selected Mario Zamora, a Latino male, instead of Turner to fill an open TSC consultant position. (Docket Entry 15, Ex. C at 121–25). Turner was not initially interested in this position, but she later decided to apply for it. The requirements for the TSC job consultant position included being able to lift forty pounds; being able to work after hours and weekends if a project required it; having three to five years experience in software support, training, or customer service, preferably in healthcare; knowledge of the Microsoft Windows operating system and Microsoft Office applications; and a two-year degree or technical program. The degree requirement would be waived for an employee who demonstrated particular competency. A four-year degree in information technology was preferred, and technical certifications and/or college were considered a plus. (*Id.*, Ex. A-28). Turner had studied business at Houston Community College in 1986 and 1987 but did not receive a degree. She attended vocational school in 1985 but did not receive a certificate. She had a certificate in Novell software. (Docket Entry No. 15, Ex. A at 13–15).

Dunphy believed that both Turner and Zamora were qualified for the position. He selected Zamora because he

> had taken a very big initiative to learn and figure out how to resolve one application. In an areas of calls for remote access he had taken the initiative. He worked a lot about it. He kind of became the point person in the group. I felt he made big strides

4

> and that showed some self initiative on Mario's part so I felt that
> was a big factor into why he got that spot.

(*Id.*, Ex. C at 124–25).

Turner acknowledged in her deposition that Zamora was qualified for the position but testified that she was more qualified.  (*Id.*, Ex. A at 112–13).  Turner testified that Zamora "didn't like to work after hours" and "actually didn't volunteer more" and "[t]hat was just the reason [Dunphy] gave me" for selecting Zamora.  (*Id.*).  Turner conceded, however, that at times Zamora worked when Turner did not and that Zamora could have been volunteering more than Turner thought.  (*Id.*, Ex. A at 114–15).  Turner stated that she was more qualified than Zamora because she and Zamora both trained at the same time.  Turner later conceded that this did not make her more qualified than Zamora.  She did not point to any other evidence showing that she was more qualified.  (*Id.*).

Turner applied for another TSC Consultant position posted in October 2005.  Dunphy selected Solomon Medhin, who Turner describes as a black male from Jamaica or Eritrea, for the position.  Dunphy stated that he made the selection:

> based on Mr. Medhin's volume of work, specifically the number
> of tickets he opened, the number of tickets he handled, and the
> number of tickets he resolved," and "based on his above and
> beyond type of attitude and commitment to St. Luke's, which he
> demonstrated during Hurricane Rita by remaining at St. Luke's
> to provide telephone support when other employees evacuated."

(Docket Entry No. 15, Exs. C at 32, E at 2).  Medhin opened and closed more calls than Turner during every month except one between January 2005 and October 2005.  (*Id.*, Ex.

5

A at 92–96, 136–37).  Medhin had received a Bachelor of Science degree in computer science with a minor in math from the University of Houston in May 2003.  (*Id.*, Ex. E at 2).

In 2005, Dunphy created a Team Leader Technical Support Analyst position to assist and coordinate work in the telephone support area.  (Docket Entry No. 15, Ex. C at 29).  The minimum job qualifications for the new position included a two-year degree; three to five years of experience in software support, training or customer service, with healthcare experience required; three to five years of experience in troubleshooting, installation, configuration, and maintenance of personal computer technology and related hardware; knowledge of the Microsoft Windows operating system and Microsoft applications, and network, LAN, or telecommunications experience. (*Id.*, Ex. A-30).  In late 2005, Dunphy selected Julie Rector, a white female, for the new position, without interviewing any candidates.  Dunphy stated:  "I felt based off Julie's past history and information I had received from other managers within information management Julie's past work and job she was doing that she would be a good fit for the team leader of the technical support analysts." (*Id.*, Ex. C at 28–29).  Dunphy explained that when he talked to other managers, Rector's name came up repeatedly.  Rector was viewed by the other managers as a "point of contact when they needed to get a hold of somebody on the telephone support side of things."  (*Id.*, Ex. C at 31).  Dunphy testified that "Rector was already acting as Lead of the TSC Department by participating in employee orientation, acting as the remedy ticket system administrator, and acting as the contact person for the TSC Department.  (*Id.*, Ex. E at 3).

In 2005, Rector had opened and closed more calls than Turner during every month except October. (*Id.*, Ex. A at 121–25).

Turner filed an EEOC charge on November 30, 2005 alleging that she was discriminated against between September 1, 2005 and November 30, 2005 because of promotion denials.  Her EEOC charge stated:

> I am currently employed as a Technical Consultant in the IT Department for Respondent.  Since last year, I applied for several vacancies and have not received a promotion.  Most recently, a Jamaican male received a promotion to Floor Technician, and several days ago a White female employee was promoted to a lead position.  Supervisor Mr. Ken Dunphy (White male) selected these individuals for these positions.  The posting for the lead position was not made available to the employees within the department.  I am more qualified than these individuals, and I have been employed with Respondent for ten years.  Other African-American employees in the IT department are also qualified for these positions and are passed over.  I have reported this problem to Employee Relations Ms. Christine Kovach, but to no avail.  When I asked her to see my personnel file, she informed me that she had to send for it.

> I believe that I am being discriminated against because of my national origin, African-American and because of my sex (female), in violation of Title VII of the Civil Rights Act of 1964, as amended.

> I believe that African-Americans in the IT department are discriminated against, because of their nation origin, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.*, Ex. B-34).

In 2006, Turner complained to Dunphy that Rector had deleted one of her tickets from the remedy ticket system.  Dunphy spoke to Rector and explained to her that she was not

permitted to delete tickets.  Dunphy gave Turner an additional ticket to make up for the one deleted by Rector.  (Docket Entry No. 15, Ex. C at 44).

On April 10, 2006, Rector spoke with TSC Analyst Dale Van Wright about his failure to follow a work procedure.  Turner overheard the conversation.  She testified that Rector referred to the TSC department as being "dumb asses."  When Van Wright protested that he was not a "dumb ass," Rector's response was, "I am saying we are all dumb asses." (Docket Entry No. 15, Ex. B at 35–36, Ex. B-36).  Turner stated that Rector's remark was directed at her because "[Rector] said we are all dumb asses and I work there."  (*Id.*, Ex. B at 37). Dunphy gave Rector a Notice of Concern because of this incident, stating that Rector had used inappropriate language and needed "to be aware of how she addresses issues with the group."  (*Id.*, Ex. B-38).

On May 5, 2006, Turner sent Dunphy an e-mail complaining about a black-and-white photocopy of an antiwar poster hanging in Rector's work area.  (Docket Entry No. 15, Ex. B-39).  The poster showed Uncle Sam's hand placed over a man's face, with the statements "Quiet!" and  "Know your place shut your face," described as "a message from homeland security."  (*Id.*, Exs. B at 32, B-39).  Turner perceived the poster as showing a white hand over a black man's mouth.  The original poster (rather than the photocopy) showed a white hand over a white man's mouth.  (*Id.*, Exs. D at 97–99, D-2).  Dunphy told Rector to take the poster down.  It was removed by May 8, 2006.  (*Id.*, Ex. B-39, Ex. C at 100).  Turner presented evidence that the poster had been up for at least two to three weeks before it was taken down.  (Docket Entry No. 41 at 38–44).

On June 21, 2006, a customer complained to Turner that another TSC employee had been rude and had not provided proper assistance. Turner told the customer that the other TSC employee was "rude like that all the time." Turner gave the customer Dunphy's extension, told the customer that nothing would be done about the other employee's actions, and asked the customer to call Turner back to report what Dunphy said. (Docket Entry No. 15, Ex. A-32). On July 7, 2006, Turner was placed on probation for 90 days for making inappropriate comments to a customer about another employee, for undermining Dunphy's authority, and negatively impacting the image of the TSC group and the information management organization. (*Id.*, Exs. A-24, D at 85-86).

Turner testified that Rector yelled at her on several occasions. (Docket Entry No. 15, Ex. B at 32–33). Turner stated that Rector took a calendar out of her hands when she was looking at it. (*Id.*, Ex. B at 33). Turner stated that Rector demeaned and intimidated her by saying "[i]f you would do what I tell you to do," and "demanding me to take a break." (*Id.*, Ex. B at 34). Turner stated that she and Rector had not gotten along as early as 2000. Turner testified that in that year, Rector called her "lazy," a "lunch monitor," and a "Harriet." (*Id.*, Ex. D at 63).

Turner stated that after she filed her EEOC charge, Rector no longer verbally communicated with her and instead used e-mail or a pager. (Docket Entry No. 15, Ex. A at 143-45). Turner stated that Rector included her in the e-mails sent to other TSC employees, but that Rector verbally repeated these messages to everyone but Turner. (*Id.*, Ex. A at 143–45). Turner complained that Dunphy did not "communicate as like he used to before,"

9

and that while "[s]ometimes he speaks," he communicates with her primarily through e-mail. (*Id.*, Ex. A at 145-46). Despite the decrease in verbal communication, Turner has never missed a meeting and is still able to perform her job. (*Id.*, Ex. A at 147).

Turner asserts that St. Luke's discriminated against her on the basis of her national origin and sex by promoting Zamora, Medhin, and Rector over her. Turner's complaint appears to assert both discriminatory impact and discriminatory treatment claims. Turner alleges that St. Luke's employed neutral hiring criteria that had a discriminatory impact on African-Americans and women. Her complaint states that "St. Luke's Technology Service Center has consistently, related to African Americans the necessity to resolve telephone calls received, at a high percentage rate to be eligible for promotions and substantial salary increases while promoting non African American females and males based on the number of calls answered regardless of resolutions made. While these practices appear to be neutral, they serve to discriminate against a disproportionate number of persons of plaintiff's national origin and sex. This flip flop of requirements for promotions and substantial salary increases is unfair and discriminatory on its face." (Docket Entry No. 1 at 7). The complaint also asserts that Turner was objectively more qualified for the promotions she sought based on St. Luke's stated evaluation standards than Zamora, Medhin, or Rector, and that these individuals were promoted over her because of national origin and sex discrimination. (*Id.* at 3–4).

Turner also claims that she was subjected to a hostile work environment based on her national origin and sex. The alleged acts that form the basis for Turner's hostile work

environment claim include Lyman calling her "stupid," demeaning her, and elbowing her in the chest; Rector calling her "lazy" and a "Harriet," taking a calendar out of her hands, demanding that she take a break, saying "[i]f you would do what I tell you to do," deleting one of her tickets, calling the TSC group "dumb asses," putting up a poster with racial overtones, and Rector and Dunphy limiting their verbal communications with her.

Turner claims that St. Luke's retaliated against her for filing a charge with the EEOC. Turner identifies many of the same acts that are the basis for her hostile work environment claim as acts of retaliation. Turner contends that Rector retaliated against her by shouting at her, deleting one of her tickets, hanging up the "know your place shut your face" poster, and limiting the nature and extent of their communications. Turner also asserts that Dunphy retaliated against her by placing her on probation and limiting the nature and extent of their communications. (Docket Entry No. 1 at 9–10; Docket Entry No. 16 at 17).

Turner also claims that Rector's and Dunphy's conduct was extreme and outrageous and that they intentionally caused her emotional distress. Turner specifically points to Rector displaying the poster and demeaning her. (Docket Entry No. 1 at 8).

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

11

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim. *Celotex*, 477 U.S. at 330. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary  judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56© burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.    Exhaustion and Limitations

St. Luke's moves for summary judgment as to the complaints Turner asserts in this lawsuit that were not in her EEOC complaint. Turner's EEOC charge was limited to events between September 1, 2005 and November 30, 2005. Her EEOC charge asserted that she was "discriminated against because of my national origin, African-American and because of my sex (female)" with regard to promotion decisions, and refers only to Dunphy's promotion of Medhin (the "Jamaican male" promoted to Floor Technician) and Rector (the "White Female" promoted to a lead position). The charge did not refer to the January 2005 promotion of Zamora. Nor did the charge refer to a hostile work environment. The charge stated that the acts of discrimination occurred between September 1, 2005 and November 30, 2005.[1]

---

[1]  There is no evidence in the record regarding the specific dates on which Medhin and Rector were promoted. St. Luke's does not contend that Turner has failed to exhaust her claims or file a timely charge with respect to the Medhin and Rector promotions.

"The filing of an administrative complaint is a prerequisite to a Title VII suit."[2] *Thomas v. Atmos Energy Corp.*, 223 Fed. Appx. 369, 376 (5th Cir. 2007); *Harris v. Honda*, 213 Fed. Appx. 258, 261 (5th Cir. 2006); *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). "A Title VII cause of action may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1992); *Pacheco*, 448 F.3d at 789 (quoting *Fine* with approval). An EEOC charge must be filed within 300 days of the alleged discrimination. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

In determining whether an allegation in a complaint falls within the scope of an EEOC complaint, a court must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789. This rule is designed to balance two competing policies. *Pacheco*, 448 F.3d at 788. On the one hand, this exhaustion requirement "serves the dual purposes of giving the employer some warning as to the conduct about which the employee is complaining and affording the EEOC and the employer an opportunity to settle the dispute through conciliation." *Benson v. Mary Kay Inc.*, No. 3:06-CV-1911-R, 2007 WL 1719927, at *1 n.1 (N.D. Tex. June 11, 2007); *see also*

---

[2] Fifth Circuit panels have disagreed over whether exhaustion is a jurisdictional requirement or simply a prerequisite to suit. *Pacheco*, 448 F.3d at 788 n.7.

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 1017 (1974) ("Cooperation and voluntary compliance were selected as the preferred means for achieving [the goals of Title VII]. To this end, Congress created the Equal Employment Opportunity Commission and established a procedure whereby existing state and local equal employment opportunity agencies, as well as the Commission, would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit.") (citations omitted); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) ("[T]he purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC.").

On the other hand, "the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally." *Pacheco*, 448 F.3d at 788 (quoting *Sanchez*, 448 F.3d at 463) (quotations omitted). The Fifth Circuit has recently clarified that its often-repeated directive to construe EEOC charges liberally, *see, e.g. Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280 n.7 (5th Cir. 1994); *Price v. Sw. Bell Tel. Co.*,, 78 (5th Cir. 1982); *Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112 (5th Cir. 1981), should not be taken as a directive to put a thumb on the scale in favor of the plaintiffs in applying the rule. "[F]or the most part, the desired liberality is achieved by application of the rule that courts will look beyond the scope of the charge's language to the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge." *Pacheco*, 448 F.3d at 789 n.9.

A discriminatory act alleged in a lawsuit but not included in an EEOC charge is not

"like or related to" acts that are alleged in an EEOC charge simply because both are based on the same type of discrimination.  In a sex discrimination case, the Seventh Circuit explained that "[b]ecause an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination." *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994); *see also Reno v. Metro. Transit Auth.*, 977 F. Supp. 812, 819 (S.D. Tex. 1997) (holding that the plaintiff had not exhausted her sexual harassment claim by filing an EEOC complaint alleging sex discrimination based on failure to promote); *Sandom v. Travelers Mortgage Servs., Inc.*, 752 F. Supp. 1240, 1247 (D.N.J.1990) ("Because a claim of sexual harassment may constitute sexual discrimination does not imply that a charge consisting of facts which purportedly constitute sexual discrimination necessarily includes all forms of sexual discrimination."); *Riley v. Tech. & Mgmt. Servs. Corp.*, 872 F. Supp. 1454, 1459 (D. Md. 1995) (holding that a charge of sex discrimination did not exhaust a claim of hostile work environment based on sexual harassment).  For an alleged discriminatory act to fall within the scope of an EEOC charge, there must be some factual relationship between that act and the acts described in the charge, beyond the fact that both involve the same employer and the same general type of discrimination.  *Cheek*, 31 F.3d at 501.

Turner's claim that she was discriminated against because Zamora was promoted over her is beyond the time period her EEOC charge addresses.  Even if this act is related to the later failures to promote, each allegedly discriminatory failure to promote is a discrete

16

discriminatory act, and a charge relating to a discrete discriminatory act must be filed within 300 days of the date of that act.  *See Nat'l R.R. Passenger Corp. (AMTRAK) v. Morgan*, 536 U.S. 101, 113–14 (2002).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Id.* at 113.

Turner argues that she should be able to assert her failure-to-promote claim relating to the Zamora promotion under the doctrine of equitable tolling.  This doctrine applies to the limitations period for filing a charge and does not excuse an employee from the requirement of filing a charge and exhausting a claim.  *See Douglas v. Potter*, No. 07-1666, 2008 WL 565079, at *3 (7th Cir. Mar. 4, 2008) ("[E]quitable tolling is not a basis for excusing a failure to exhaust administrative remedies altogether."); *O'Rourke v. Continental Casualty Co.*, 983 F.2d 94, 97 (7th Cir. 1993) ("Equitable tolling enlarges the time within which to proceed but does not justify omitting steps such as the administrative charge that Congress has made essential."); *Sommatino v. United States*, 255 F.3d 704, 710 (9th Cir. 2001) ("[E]quitable tolling can extend the deadline for filing when equity so requires. . . . However, equitable remedies are unavailable when the record shows that no administrative filing was ever made."); *Hines v. Widnall*, 334 F.3d 1253, 1257 (11th Cir. 2003) ("[Plaintiff] does not qualify for an exception to the exhaustion requirement . . . because filing a complaint with the EEOC is a prerequisite to the equitable exceptions to administrative exhaustion.").  In any case, equitable tolling would not apply to the January 2005 failure-to-promote claim.  *See Manning v. Chevron Chem. Co.*, 332 F.3d 874, 880 (5th Cir. 2003)  ("We have identified three potential bases for equitable tolling [in an employment discrimination suit]: (1) the pendency

17

of a suit between the same parties in the wrong forum; (2) the plaintiff's lack of awareness of the facts supporting his claim because of the defendant's intentional concealment of them; and (3) the EEOC's misleading the plaintiff about his rights."). The record shows that Turner was aware of the facts supporting her failure-to-promote claim within the 300-day period but did not file a charge within that period.

To the extent that Turner asserts a disparate impact claim, this claim may not be asserted because it has not been exhausted. In *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006), the court held that "a disparate-impact investigation could not reasonably have been expected to grow out of [the plaintiff's] administrative charge because of the following matters taken together: (1) it facially alleged disparate treatment; (2) it identified no neutral employment policy; and (3) it complained of past incidents of disparate treatment only." *See also McClain v. Lufkin Indus.*, No. 05-41417, 2008 WL 542165, at *3–4 (5thc Cir. Feb. 29, 2008) (quoting and discussing *Pacheco*). The *Pacheco* court emphasized that a "neutral employment policy is the cornerstone of any EEO disparate-impact investigation, since the EEO must evaluate both the policy's effects on protected classes and any business justifications for the policy." *Id.* Here, as in *Pacheco*, Turner's EEOC charge complains only of being singled out in the past for intentional discrimination in promotion decisions because she was a member of a protected class. The charge does not identify a neutral employment policy that was discriminatorily applied.

Although Turner describes this aspect of her claim as "disparate impact," the conduct she points to is properly considered as part of her disparate treatment claim. She alleges a

18

"flip-flop" that applied a different standard to her as an African-American employee seeking promotion than was applied to non-African-American employees.  This alleged conduct is properly the subject of a discriminatory treatment claim, not a discriminatory impact claim.

The EEOC charge does not assert that Turner was subjected to a hostile work environment because of her national origin or sex.  The charge does not refer to any of the conduct that Turner now claims created a hostile work environment.  Turner's hostile work environment claims are not "like or related to the charge's allegations."  The alleged acts that form the basis for Turner's hostile work environment claim, including Lyman calling Turner stupid, demeaning her, and elbowing her in the chest; Rector calling Turner lazy and a "Harriet," taking a calendar out of her hands, demanding that she take a break, saying "[i]f you would do what I tell you to do," deleting one of her tickets, calling the TSC group "dumb asses," putting up a poster with racial overtones, and Rector and Dunphy limiting their communications with Turner, have no factual relationship with St. Luke's failure to promote Turner "beyond the fact that both involve the same employer and the same general type of discrimination." *Cheek*, 31 F.3d at 501.  Turner's hostile work environment claims could not "reasonably be expected to grow" out of the investigation into her EEOC charge. *See Cheek*, 31 F.3d at 501; *Reno*, 977 F. Supp. at 819; *Sandom*, 752 F. Supp. at 1247; *Riley*, 872 F. Supp. at 1459.  Although Turner asserts that equitable tolling should apply to her hostile work environment claim, this doctrine does not excuse an employee from exhaustion and the requirements for applying the doctrine are not present here. *See Douglas*, 2008 WL 565079, at *3.

19

Turner has not filed an EEOC charge alleging retaliation for filing the November 30, 2005 charge.  However, "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court."  *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981)), *quoted in Eberle v. Gonzales*, 240 Fed. Appx. 622, 628 (5th Cir. 2007).  "It is the nature of retaliation claims that they arise after the filing of the EEOC charge.  Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case, a double filing that would serve no purpose except to create additional procedural technicalities."  *Gupta*, 654 F.2d at 414.

Turner asserts that many of the same underlying acts that are the basis for her hostile work environment claim are also acts of retaliation.  Turner asserts that Dunphy retaliated against her by shouting at her, deleting one of her tickets, hanging up the  "know your place shut your face" poster, and limiting the nature and extent of their communications.  Turner asserts that Dunphy retaliated against her by placing her on probation and limiting the nature and extent of their communications.  (Docket Entry No. 1 at 9–10; Docket Entry No. 16 at 17).  These claims are properly before this court.

Turner has failed to exhaust her disparate treatment claim with respect to St. Luke's promotion of Zamora, her disparate impact claim, and her hostile work environment claim.  She has satisfied the exhaustion requirement for her retaliation claim and her disparate treatment claim with respect to the decisions to promote Medhin and Rector.

## IV.     Discrimination

When a plaintiff alleges that the defendant discriminated in employment decisions on the basis of national origin or sex and presents proof of alleged discrimination through indirect or circumstantial evidence, the claim is considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination. For a failure to promote claim, a plaintiff satisfies this burden by showing that: (1) she was within a protected class; (2) she was qualified for the position sought; (3) she was not promoted; and (4) the position she sought was filled by someone outside the protected class. *Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001); *Hill v. Fort Bend Indep. Sch. Dist.*, No. 01-20297, 2001 WL 1223672, at *2 (5th Cir. Sept. 26, 2001).

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must then offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic

21

(mixed-motives alternative)." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual). If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the *prima facie* case, will usually be sufficient to survive summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 146-48.

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

A plaintiff may create a fact issue by providing evidence that he was "clearly better qualified" than the employee chosen for the position. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356–57 (5th Cir. 2001); *Manning v. Chevron Chem. Co.*, 332

22

F.3d 874, 882 (5th Cir. 2003) (internal citations omitted); *see also Reynolds v. Rumsfeld*, 127 Fed. Appx. 154, **1 (5th Cir. 2005). "However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Celestine*, 266 F.3d at 357 (*quoting Deines v. Tex. Dept. of Prot. & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999)).

The Supreme Court has recognized that evidence of a plaintiff's superior qualifications may establish pretext "in some circumstances." *Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195, 1197 (2006) (per curiam). The Court noted that several circuits find an inference of pretext only if "the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face." *Id.* at 1197–98. The Court rejected this standard but declined to "define more precisely what standard should govern pretext claims based on superior qualifications." *Id.* at 1198. The "clearly better qualified" standard set forth by the Fifth Circuit is not similar to the standard the Court found faulty in *Ash*. *See, e.g., Celestine*, 266 F.3d at 357; *Manning*, 332 F.3d at 882.

St. Luke's seeks summary judgment on Turner's discrimination claims on the ground that it has articulated legitimate nondiscriminatory reasons for the challenged decisions not to promote Turner and that she has failed to raise a disputed fact issue as to pretext. St. Luke's concedes that Turner had worked in the TSC Department longer than Medhin and that she had previously shared the TSC consultant position in 2002 and 2003. St. Luke's

23

contends that other legitimate nondiscriminatory reasons support its decision to promote Medhin over Turner.  Dunphy stated that he made the promotion decision "based on Mr. Medhin's volume of work, specifically the number of tickets he opened, the number of tickets he handled, and the number of tickets he resolved."  Dunphy also cited Medhin's "above and beyond type of attitude and commitment to St. Luke's, which he demonstrated during Hurricane Rita by remaining at St. Luke's to provide telephone support when other employees evacuated."  (Docket Entry No. 15, Exs. C at 32, E at 2).  The information Dunphy considered included that Medhin had opened and closed more calls than Turner during every month except one between January 2005 and October 2005, and Medhin had a Bachelor of Science degree in computer science with a minor in math from the University of Houston, while Turner had not graduated from college.  (*Id.*, Ex. A at 92–96, 136–37, Ex. E at 2).

St. Luke's asserts that it promoted Rector because of her work history, reputation with the managers, and the number of calls that she opened and closed.  Dunphy stated, "I felt based off Julie's past history and information I had received from other managers within information management Julie's past work and job she was doing that she would be a good fit for the team leader of the technical support analysts."  (Docket Entry No. 15, Ex. C at 28–29).  Dunphy explained that when he talked to managers, Rector's name came up repeatedly.  Rector was viewed by the other managers as a "point of contact when they needed to get a hold of somebody on the telephone support side of things."  (*Id.*, Ex. C at 31).  Dunphy asserted that "Rector was already acting as Lead of the TSC Department by

24

participating in employee orientation, acting as the remedy ticket system administrator, and acting as the contact person for the TSC Department. (*Id.*, Ex. E at 3). In 2005, Rector opened and closed more calls than Turner during every month except October. (*Id.*, Ex. A at 121–25).

Turner contends that the proffered nondiscriminatory reasons are pretextual because St. Luke's told her and other African-American employees that a high-call resolution percentage – as opposed to the overall number of calls opened and closed – was the most important factor considered for pay and promotions, but St. Luke's based its decision to promote Medhin on the number of calls he opened. (Docket Entry No. 1 at 7; Docket Entry No. 15, Ex. B-41; Docket Entry No. 16 at 6; *Id.*, Ex. D at 34). Dale Van Wright, an African-American male and one of Turner's coworkers, stated that when he asked about what was necessary to obtain a promotion, he was told that a high percentage of resolved calls was the most important consideration. (Docket Entry No. 16, Ex. D at 34.). In an e-mail to Dunphy entitled "evaluation scores in certain areas," Turner asked why Dunphy had emphasized the importance of call-resolution percentages in her evaluation but later stated in a meeting "that the percentage was not that important." (Docket Entry No. 15, Ex. B-41). In response to Turner's question, Dunphy stated that his statement deemphasizing the percentage of calls closed did not mean that this was unimportant but rather that it was not the "end all be all" in deciding whether she would be promoted as new positions opened. (*Id.*, Ex. B-41).

An employer's inconsistent explanations for its employment decisions may permit a jury to infer that the employer's proffered reasons are pretextual. *See Laxton v. Gap Inc.*, 333

F.3d at 578.  St. Luke's has been consistent in explaining why it promoted Medhin.  The explanation is also consistent with Turner's and Van Wright's testimony that St. Luke's had emphasized the importance of call-resolution percentages in promotions and evaluations. Turner does not point to record evidence showing that St. Luke's told her or other employees that resolution ratios were the sole factor considered in promotion decisions.  Turner's evidence shows that St. Luke's emphasized resolution ratios as an important factor, but not the only factor, in personnel evaluations and promotion decisions.  This is consistent with the reason St. Luke's offered for promoting Medhin over Turner.

Turner also argues that she was more qualified than Medhin because she had a higher call-resolution ratio and more experience than Medhin.  (Docket Entry No. 16, Ex. D at 24, 34).  The evidence Turner cites does not raise a fact issue as to whether she was "clearly better qualified" than Medhin.  *See Celestine*, 266 F.3d at 356–57.  "[T]he mere fact that one person has worked longer than another does not establish that she is "clearly better qualified" for the position." *Harris v. Fresenius Med. Care*, No. H-04-4807, 2006 WL 2065313, at *14 (S.D. Tex. July 24, 2006).  Although Medhin did not have as much tenure as Turner or as high a call-resolution ratio, Medhin had a stronger educational background, had opened and closed more tickets than Turner, and had demonstrated a high level of commitment to St. Luke's by remaining during a hurricane.  The difference in qualifications between Turner and Medhin is not "'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Celestine*, 266 F.3d at 357.

26

As to Rector, Turner contends that the nondiscriminatory reasons proffered for the promotion decision are pretextual because "when Ms. Turner was performing all the responsibilities of 'running' the department by being the lead person and training all the new people, she was neither given a title which reflected the same nor was she given an increase in salary to go along with increased responsibilities."  (Docket Entry No. 1 at 7–8; Docket Entry No. 16 at 6). The fact that Rector was already acting as Lead of the TSC Department when she was promoted was not the sole reason given by St. Luke's for Rectors promotion. St. Luke's also pointed to Rector's work performance, the fact that Rector's name came up repeatedly when Dunphy spoke with other managers, that other managers thought that Rector would be a good fit for the team leader of the technical support analysts, that Rector was viewed by the other managers as a point of contact, and that Rector had a high work volume. Turner has neither identified nor submitted evidence showing that St. Luke's inconsistently applied its promotion criteria or that Turner was "clearly better qualified" than Rector.  *See Celestine*, 266 F.3d at 356–57.

Summary judgment is granted on the failure-to-promote claim.[3]

## V.    Retaliation

Turner asserts that Rector retaliated against her after she filed her EEOC complaint, by shouting at her, deleting one of her tickets, putting up the  "know your place shut your

---

[3]  The result is the same even if Turner's claim that Zamora's promotion in January 2005 is considered.  Turner acknowledged that she was not more qualified than Zamora for the job.  (Docket Entry No. 15, Ex. A at 115).  Turner has not identified or submitted summary judgment evidence raising a fact issue as to whether the reasons St. Luke's proffered for promoting Zamora over Turner were a pretext for national origin or sex discrimination.

face" poster, and limiting the nature and extent of their communications.  Turner asserts that Dunphy retaliated against her by placing her on probation and limiting the nature and extent of their communications.  (Docket Entry No. 1 at 9–10; Docket Entry No. 16 at 17).  St. Luke's argues that these alleged acts are not "adverse employment actions," that Turner cannot establish a causal link between her protected activity and the alleged retaliatory acts, and that Turner cannot raise a fact issue as to whether the articulated legitimate nondiscriminatory reasons for the challenged acts were pretextual.  (Docket Entry No. 15 at 22–25).

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Title VII retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007); *Thomas*, 223 Fed. Appx. at 376;  *Septimus v. Univ. of Houston*, 399 F.3d 601, 607-10 (5th Cir.2005); *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 330 (5th Cir. 2004); *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414-15 (5th Cir.2003).  Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation, which requires a showing that: (1) the plaintiff engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the

28

protected activity and the adverse employment action.  *McCoy*, 407 F.3d at 556-57.  If a plaintiff makes a prima facie showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action.  *Id.* at 557.  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation.  *Id.*  The standard of proof at the pretext stage requires the plaintiff to show that the adverse employment action would not have occurred but for her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d at 607; *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

The Supreme Court recently rejected the position, previously adopted in this circuit, that an "adverse employment action" in a retaliation claim is limited to "ultimate employment decisions."  In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2409 (2006), the Supreme Court held that an adverse employment action "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee," which in the retaliation context "means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  The standard for harm is objective. *Id.* at 2415.  "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not" satisfy the materiality requirement because these are ordinary tribulations "that often take place at work and that all employees experience."  *Id.*  The significance of an allegedly retaliatory act depends on the particular circumstances of the individual employee.  "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and

relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)). The Fifth Circuit case law since *Burlington Northern* follows this approach. *Compare McCoy*, 492 F.3d at 559 (applying the *Burlington Northern* standard), *with Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707-08 (5th Cir. 1997) (applying the previous Fifth Circuit standard).

In *Rivera-Rocca v. RG Mortgage Corp.*, No. 06-1570(§), 2008 WL 482697, at *9 (D.P.R. Feb. 25, 2008), the plaintiff complained that her manager "retaliated against her by making derogatory comments, calling her names and warning other employees that they should be careful because some employees could file grievance complaints against them, which Plaintiff took as a reference to her complaint."  The plaintiff in that case stated:

> At the beginning of her employment with RG, her relationship with Robles was normal, however, it changed when Plaintiff became a supervisor and Robles became a Manager.  Plaintiff perceived that Robles had an attitude problem towards her, as well as towards other employees; Robles was rude, intransigent and a bad mouth.  She yelled at employees and exerted too much pressure on them. Plaintiff believed that Robles had no business ethics.

*Id.*  The court stated that the plaintiff's "only complaint was that [her manager] was rude to her" and concluded that "[t]his claim, in and of itself is not sufficient to meet the severity required for a retaliation action." *Id.*

In *Juarez v. Utah Dept. of Health-Family Dental Plan*, No. 2:05CV0053PGC, 2006 WL 2623905, at *12 (D. Utah Sept. 11, 2006), the court found that "evidence of [the

plaintiff's] fellow employees pulling away from her and treating her coldly fails to support an inference of actionable retaliation."  The court noted that "it was no doubt unpleasant for [the plaintiff] to face snide comments and the cold shoulder," but that, "[a]lthough undesirable, this type of shunning and rejection by co-workers is not sufficiently severe to interfere with Juarez's access to Title VII's remedial mechanisms in any meaningful way." *Id*; *see also Higgins v. Gonzalez*, No. 06-2556, 2007 WL 817505, at *10 (8th Cir. March 20, 2007) (noting that plaintiff "cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs"); *Gardner v. District of Columbia*, 448 F. Supp. 2d 70, 76 (D.D.C. 2006) (holding that glaring at plaintiff in "an angry and alienating fashion" was not an adverse action).

The record as to retaliation includes evidence that Rector raised her voice to Turner, called her a "Harriet," and was rude, and that Rector and Dunphy did not talk to her, instead relying on email.  Cases since *Burlington Northern* have held that similar allegations amounted to "petty slights, minor annoyances, and simple lack of good manners," that do not rise to materially adverse employment actions.  *See Burlington Northern*,126 S. Ct. 2405 at 2415; *Rivera-Rocca*, 2008 WL 482697, at *9; *Juarez*,  2006 WL 2623905, at *12 .  Turner did not miss a meeting because of the decreased communication.  (Docket Entry No. 15, Ex. A at 147).  Turner also testified that it did not impair her ability effectively to perform her job. (*Id.*, Ex. A at 147).

Turner also cites Rector's placement of the poster, which Turner saw as racially offensive and believed was intended to intimidate, as retaliatory conduct.  Courts have found

that much more overtly intimidating behavior was not retaliation because it would not "dissuade a reasonable worker from making or supporting a charge of discrimination."  In *Henry v. Milwaukee County*, No. 04-C-432, 2007 WL 1577666, at *4 (E.D. Wis. May 31, 2007), a supervisor told the plaintiff "on more than one occasion that he was going to 'get her' or 'take care of her' and "slammed a door in [the plaintiff's] face when she arrived late for a grievance meeting."  The court found that "[n]one of these actions, taken separately or in combination, meet the objective standard set forth in *Burlington*."  *Id.*  Similarly, the deletion of one of Turner's tickets was not materially adverse.  Dunphy immediately restored the deleted ticket.  Such a temporary deprivation, with no long-term consequences, was not "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 126 S. Ct. at 2415.

Turner also alleges that the reprimand she received in July 2006 for making inappropriate comments to a customer about another employee and a supervisor, and the 90-day probation, was retaliatory.  Such a reprimand is a materially adverse employment action. *See Nugent v. St. Luke's/Roosevelt Hosp. Center*, No. 05 Civ. 5109(JCF), 2007 WL 1149979, at *10 (April 18, 2007) (finding that a written warning qualified as an adverse employment action under *Burlington Northern*).  However, Turner has failed to raise a fact issue as to a causal link between her November 30, 2005 EEOC charge and her July 7, 2006 reprimand and probation.  "A causal connection may be established either indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly

through evidence of retaliatory animus directed against a plaintiff by the defendant." *Id.*

(quotations omitted).  Turner contends that she was disciplined "for an incident which was

seemingly similar to the act and actions of others who were not disciplined."  (Docket Entry

No. 16 at 17).  Turner stated in her deposition that "when other people have complained about

– about my co-workers being rude, Mr. Dunphy has always said no big deal, and he would

just tell the person next time just be more careful.  But in my case, he went to the extreme of

putting me on probation without even giving me a notice of concern or a written warning."

(Docket Entry No 15, Ex. A at 158).  Turner conceded, however, that she was not disciplined

for being rude to a customer.  Rather, she was reprimanded for making inappropriate

comments to a customer about St. Luke's employees and a supervisor.  Disparate treatment

of coworkers who engage in dissimilar conduct is not evidence of a causal connection

between protected activity and the challenged employment action.  In the absence of evidence

showing a causal connection, the seven-month gap between the protected activity and the

alleged retaliation is insufficient to show causation.  *See, e.g. Clark County School District

v. Breeden*, 532 U.S. 268, 273-74 (2001) (stating that "cases that accept mere temporal

proximity between an employer's knowledge of protected activity and an adverse employment

action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must

be very close," and citing cases finding gaps of three and four months insufficient); *Conner

v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four months insufficient);

*Donlon v. Group Health Inc.*, No. 00 Civ. 2190, 2001 WL 111220, at *3 (S.D.N.Y. Feb. 8,

2001) (eight and one-half months insufficient); *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F.

Supp. 133, 138 (S.D.N.Y.1987) (seven months insufficient).

Summary judgment is granted as to the retaliation claim.

## VI.    Intentional Infliction of Emotional Distress

Turner claims that Rector's and Dunphy's conduct was extreme and outrageous and that they intentionally caused her emotional distress.  Turner specifically points to Rector displaying the poster and demeaning her as examples of outrageous conduct.  (Docket Entry No. 1 at 8).

"[I]ntentional infliction of emotional distress is a 'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005).  "Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill." *Id.*  If a plaintiff's "complaints are covered by other statutory remedies, she cannot assert them as intentional infliction claims . . . ." *Id.* Turner may not assert an intentional infliction of emotional distress claim because it is based on the same underlying conduct as her Title VII claims.  *See id.* (finding that a plaintiff may not assert a claim for intentional infliction of emotional distress based on a supervisor's lewd advances because her complaints were covered by a state antidiscrimination statute).

Even if Turner could assert a claim for intentional infliction of emotional distress, the conduct she alleges was not "so outrageous in character, and so extreme  in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See id.* at 817–18 (quotations omitted) (finding that a supervisor's successful effort to have an employee evicted from her home was "callous, meddlesome,

34

mean-spirited, officious, overbearing, and vindictive," but that it was not sufficiently outrageous to amount to intentional infliction of emotional distress).

Summary judgment is granted on the intentional infliction of emotional distress claim.

## VI.   Conclusion

The motion for summary judgment filed by St. Luke's is granted.  Final judgment is entered by separate order.

SIGNED on March 14, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

35